UNITED STATES COURT OF APPEALS
FOR THE FIRST CIRCUIT

No. 92-1633

IN RE: EXTRADITION OF CURTIS ANDREW HOWARD.

UNITED STATES OF AMERICA,

Petitioner, Appellee,

v.

CURTIS ANDREW HOWARD,

Respondent, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Edward F. Harrington, U.S. District Judge]

Before

Selya, Circuit Judge,

Campbell, Senior Circuit Judge,

and Cyr, Circuit Judge.

Jeffrey A. Denner, with whom George Garfinkle and Perkins,

Smith & Cohen were on brief, for appellant.

Victor A. Wild, Assistant United States Attorney, with whom

A. John Pappalardo, United States Attorney, was on brief, for

appellee.

June 30, 1993

SELYA, Circuit Judge. This appeal presents several
SELYA, Circuit Judge.

issues of first impression in extradition law generally and, more

specifically, regarding a rather distinctive extradition treaty

in force between the United States and the United Kingdom of

Great Britain and Northern Ireland (U.K.). We must determine,

inter alia, (1) whether, under the treaty, the second of two

successive appeals from a certification of extraditability is

within our jurisdiction; (2) if so, what standard of review

governs such appeals; (3) whether the treaty alters the venerable

rule of noninquiry; and (4) if so, to what extent. After

grappling with these, and other, matters, we eventually address

the merits of the appeal and conclude that the determination of

extraditability must stand.

I. BACKGROUND

The seeds of this appeal were sown on June 1, 1991,

when a policeman discovered the mutilated body of Catherine

Elizabeth Ayling, a young white female, in the trunk of a rental

car abandoned at England's Gatwick Airport. Suspicion

immediately centered on respondent-appellant Curtis Andrew

Howard, a United States citizen. Charges were preferred.

Because Howard had returned to his native land, British

authorities sought to extradite him. On June 5, 1991, the United

States Attorney for the District of Massachusetts requested and

received from a federal magistrate judge a warrant for Howard's

provisional arrest. See 18 U.S.C. 3184 (1988 & Supp. II 1990);

D. Mass. Loc. Mag. R. 1(e). Howard was apprehended. He appeared

2

for an extradition hearing before the magistrate judge on

September 10, 1991.

At the hearing Howard did not dispute the existence of

probable cause to believe he had murdered Ayling. Rather,

Howard, who is black, argued that he would be prejudiced during

legal proceedings in the U.K. by reason of his race and

nationality, a circumstance which, if true, constituted a defense

to extradition under the relevant treaty. See Supplementary

Extradition Treaty, June 25, 1985, U.S.-U.K., art. 3(a),

reprinted in S. Exec. Rep. No. 17, 99th Cong., 2d Sess. 15-17

(1986) (Supplementary Treaty). In support of this defense,

Howard proffered evidence of flamboyant publicity surrounding his

case, sought to show that Britons would likely be prejudiced

against blacks particularly those accused of murdering young

white females and pointed out that England's legal system does

not make any provision for voir dire of prospective jurors.

These proffers did not sufficiently impress the magistrate: he

ruled that Howard had not established a valid defense to

extradition and thereupon issued a certification of

extraditability, together with an order of commitment.1 See 18

U.S.C. 3184.

1The magistrate found that all the basic prerequisites to
extradition had been fulfilled in that the United States and the
U.K. are parties to an extradition treaty; a criminal charge is
pending against Howard in the U.K.; the charged offense is an
extraditable crime under the treaty; the person charged is the
same person whom the government wants extradited; an arrest
warrant is outstanding; and probable cause exists to believe that
Howard committed the crime. None of these findings are contested
on appeal.

3

Howard appealed. The district court exercised

jurisdiction, reviewed the magistrate's findings for clear error,

and affirmed. See In re Howard, 791 F. Supp. 31 (D. Mass. 1992).

Howard appeals anew.

II. THE SUPPLEMENTARY TREATY

Because the Supplementary Treaty departs from accepted

extradition protocol, we trace its origins and spotlight its key

provisions.

In 1972, the United States and the U.K. negotiated new

terms governing reciprocal extradition from one nation's

territory of persons accused or convicted of certain offenses

committed in the other nation. See Extradition Treaty, June 8,

1972, U.S.-U.K., art. I, 28 U.S.T. 227, 229 (Treaty). Under the

Treaty, murder was an extraditable offense. See id. art. III(1).

Nonetheless, the Treaty allowed a signatory to refuse extradition

if it regarded the offense "as one of a political character."

Id. art. V(c)(i). This exception sired friction between the two

traditional allies when federal judges in the United States began

interpreting it to bar extradition of members of the Provisional

Irish Republican Army. See S. Exec. Rep. No. 17, supra, at 2;

see also 132 Cong. Rec. 16,558-86 (1986) (collecting cases).

To ameliorate this situation, the signatories

negotiated treaty amendments aimed at eradicating the political

offense exception for acts of violence. See S. Treaty Doc. No.

8, 99th Cong., 1st Sess. (1985) (Proposed Supplementary Treaty);

see also S. Exec. Rep. No. 17, supra, at 2. However, when

4

President Reagan submitted the Proposed Supplementary Treaty to

the Senate, seeking its advice and consent, the document received

mixed reviews. See United States and United Kingdom

Supplementary Extradition Treaty: Hearings Before the Senate

Comm. on Foreign Relations, 99th Cong., 1st Sess. (1985).

Following many months of strident debate, the opposing camps

reached a compromise, placing most violent crimes beyond the

political offense exception's reach but adding certain novel

safeguards for the protection of potential extraditees. See S.

Exec. Rep. No. 17, supra, at 4-5. On July 17, 1986, the Senate

ratified the proposed treaty subject to the addition of these,

and other, amendments. See 132 Cong. Rec. 16,819 (1986).

Following approval of the modified version by the House of

Commons, instruments of ratification were exchanged on December

23, 1986. See Supplementary Treaty, supra, reprinted at Hein's

No. KAV 2053; see also I.I. Kavass et al., Extradition: Laws and

Treaties 920.20d-h (1979 & Supp. 1989). At that point, the

Supplementary Treaty went into force.

An aspect of the Senate-forged compromise lies at the

core of the instant case. As ratified, the Supplementary Treaty

prohibits extradition "if the person sought establishes . . . by

a preponderance of evidence that . . . he would, if surrendered,

be prejudiced at his trial or punished, detained or restricted in

his personal liberty by reason of his race, religion,

nationality, or political opinions." Supplementary Treaty, art.

3(a). Appellant's case rests squarely upon this proviso.

5

III. APPELLATE JURISDICTION

The Supplementary Treaty stipulates that the trier's

findings with regard to an article 3(a) defense are "immediately

appealable by either party to the United States district court,

or court of appeals, as appropriate." Id. art. 3(b). The

initial question that commands our attention concerns the extent

of our jurisdiction under this provision. We raised this issue

at oral argument, as a court must when it harbors doubts about

the existence of its subject matter jurisdiction, see In re

Recticel Foam Corp., 859 F.2d 1000, 1002 (1st Cir. 1988)

(emphasizing that "a court has an obligation to inquire sua

sponte into its subject matter jurisdiction"), and directed the

parties to furnish supplemental briefs.2

A. Past Practice.

Ordinarily neither party to an extradition proceeding

may challenge a decision rendered therein by direct appeal. This

disability developed because the relevant statute, 18 U.S.C.

3184, does not contemplate hearings by United States courts qua

United States courts, see In re Mackin, 668 F.2d 122, 125-30 (2d

Cir. 1981) (collecting authorities and tracing history of

extradition proceedings), but, instead, directs that extradition

matters be heard by "any justice or judge of the United States,"

any authorized magistrate, or certain state judges. Therefore,

2It is, of course, settled that parties cannot confer
subject matter jurisdiction on a federal court by acquiescence or
agreement. See Insurance Corp. of Ir. v. Compagnie Des Bauxites

De Guinee, 456 U.S. 694, 702 (1982).

6

an officer who presides over such a proceeding is not exercising

"any part of the judicial power of the United States." In re

Kaine, 55 U.S. (14 How.) 103, 120 (1852). Rather, the officer

acts in a non-institutional capacity by virtue of a "special

authority." In re Metzger, 46 U.S. (5 How.) 176, 191 (1847); see

also Shapiro v. Ferrandina, 478 F.2d 894, 901 n.3 (2d Cir.)

(applying same principle to current statutory provision), cert.

dismissed, 414 U.S. 884 (1973); Mackin, 668 F.2d at 125-30

(same); Jimenez v. Aristeguieta, 290 F.2d 106, 107 (5th Cir.

1961) (same). The officer's only tasks are to determine whether

an individual is extraditable, and if so, to certify

extraditability to the ultimate decisionmaker (the Secretary of

State). See 18 U.S.C. 3184, 3186 (1988 & Supp. II 1990).

In light of this curious arrangement, numerous courts

have held that 28 U.S.C. 1291, which permits appeals of "final

decisions of the district courts" (emphasis supplied), does not

contemplate appeals from decisions of judicial officers sitting

in extradition matters. See, e.g., Ahmad v. Wigen, 910 F.2d

1063, 1065 (2d Cir. 1990); Quinn v. Robinson, 783 F.2d 776, 786

n.3 (9th Cir.), cert. denied, 479 U.S. 882 (1986). Given the

absence of any other statutory hook on which jurisdiction over

such appeals can be hung, a putative extraditee customarily can

challenge an order for extradition only by collateral attack,

typically through habeas corpus. See Collins v. Miller, 252 U.S.

364, 369 (1920); Koskotas v. Roche, 931 F.2d 169, 171 (1st Cir.

1991). By the same token, the government, if it fails in an

7

extradition attempt, cannot appeal, but must file anew. See

Mackin, 668 F.2d at 128; Hooker v. Klein, 573 F.2d 1360, 1364-68

(9th Cir.), cert. denied, 439 U.S. 932 (1978); see also Collins

v. Loisel, 262 U.S. 426, 430 (1923).

B. Article 3(b).

Appellant argues that the Supplementary Treaty

revolutionizes this praxis insofar as the extradition target

asserts defenses cognizable under article 3(a). The government

argues the inverse, imploring that neither the President nor the

Senate intended to work so abrupt a tergiversation. We agree

with appellant that the Supplementary Treaty, which has the force

of law, U.S. Const. art. VI, cl. 2, effects a sea change in

established policy.

The Supplementary Treaty provides that a finding anent

a so-called article 3(a) defense, involving race, religion,

nationality, or political opinion, "shall be immediately

appealable by either party to the United States district court,

or court of appeals, as appropriate." Supplementary Treaty, art.

3(b). This appeal provision, which apparently finds its genesis

in an earlier (failed) attempt to alter the protocol prohibiting

direct appeals in extradition matters, see 132 Cong. Rec. 16,599

(1986), is couched in plain language and, in our view, means

precisely what it says. See Sumitomo Shoji America, Inc. v.

Avagliano, 457 U.S. 176, 180 (1982) (explaining that a treaty's

literal language must be given effect unless patently contrary to

the signatories' intentions and expectations). In crafting the

8

appeal provision, the drafters carefully drew a distinction

between hearings held under 18 U.S.C. 3184 and appeals taken to

courts cloaked with the judicial power of the United States. In

discussing the former, the document refers to "the competent

judicial authority" who is "[i]n the United States."

Supplementary Treaty, art. 3(b); see also id. arts. 2, 3(a). By

contrast, in discussing appeals, the treaty refers to United

States courts by name. See id. art. 3(b). The same distinction

recurs in the legislative history. See, e.g., S. Exec. Rep. No.

17, supra, at 8. That is a significant datum, for, if the

language of a treaty is at all ambiguous, courts may look to

legislative history in interpreting its provisions under

virtually the same rules that obtain when courts interpret

statutes. See Factor v. Laubenheimer, 290 U.S. 276, 294-95

(1933).

The other straws in the interpretive wind bend in the

same direction. The Supplementary Treaty stipulates that the

"Federal Rules of Appellate Procedure or Civil Procedure, as

appropriate, shall govern the appeals process." Supplementary

Treaty, art. 3(b). And, again, the legislative history

reinforces the point, indicating that the disputed provision "is

not intended to make the Federal rules generally applicable to

the extradition hearing itself, but only to the appeal of a

decision under article 3(a)." S. Exec. Rep. No. 17, supra, at 8.

In short, the text of article 3(b), taken as a whole, suggests

not only that an appeal thereunder represents an entry into the

9

federal courts but also that extradition proceedings involving

article 3 differ in kind from those involving only 18 U.S.C.

3184.

We rule, therefore, that the Supplementary Treaty marks

a clean break from the ancient prohibition on direct appeals in

extradition matters; where article 3 is implicated, the

Supplementary Treaty contemplates at least one appeal as of

right. Accord In re McMullen, 981 F.2d 603, 609 (2d Cir. 1993)

(en banc). Moreover, because the Supplementary Treaty explicitly

identifies United States courts, not judges or justices, as the

appellate authority, see Supplementary Treaty, art. 3(b), it

unlocks the gate which has historically barred extradition

matters from proceeding further through the federal courts in the

same manner as other cases.

C. Successive Appeals.

Our jurisdictional odyssey is not yet ended. Noting

that article 3(b) provides for appeals to the district court or

court of appeals, the government asserted below that this

disjunctive language restricts the parties to one bite of the

apple and rules out successive appeals (such as Howard essays).

In this court, however, the government backtracks, appearing to

concede that, notwithstanding Howard's earlier appeal, we have

jurisdiction over this appeal. But, since this point implicates

appellate jurisdiction and is non-frivolous, see post (Campbell,

J., concurring), we are not at liberty simply to accept the

government's concession. See supra note 2. We proceed to ponder

10

the point.

We think the language of article 3(b) dictates a

construction antithetic to that which the government urged below.

Because the Supplementary Treaty contemplates the initiation of

extradition proceedings before either a district judge or a

magistrate judge, see S. Exec. Rep. No. 17, supra, at 5, 6, 8,

article 3(b) prudently provides for review by the "district

court, or court of appeals, as appropriate." In other words, the

disjunctive "or" is to be read not as an unusual, but

understated, restriction on the number of appeals; rather, the

term specifies that the ordinary sequence of appeals should

apply. This conclusion is supported by the reference in article

3(b) to the "appeals process," as well as by the legislative

history. See S. Exec. Rep. No. 17, supra, at 8.

We will not cart coal to Newcastle. Not even so much

as a solitary word or phrase in the Supplementary Treaty

intimates an intent to prohibit successive appeals and it is

not the courts' business to rewrite a treaty's text.3

Accordingly, we hold that article 3(b) permits successive

appeals, see, e.g., United States v. Van Fossan, 899 F.2d 636,

637-38 (7th Cir. 1990) (holding that, in the absence of an

express provision prohibiting successive appeals, the criminal

misdemeanor statute, 18 U.S.C. 3402 (1988), permits them);

3We appreciate the force of the policy considerations
mentioned by Judge Campbell, see post (Campbell, J., concurring),

but we believe that such matters must be left to those charged
with negotiating, executing, and ratifying treaties.

11

United States v. Forcellati, 610 F.2d 25, 28 (1st Cir. 1979)

(similar), cert. denied, 445 U.S. 944 (1980), to be given

expedited consideration, however, as article 3(b) itself

provides, "at every stage."

D. Recapitulation.

To sum up, the language and legislative history of the

Supplementary Treaty make it clear that the appeal right provided

by article 3(b) implicates a "decision[] of the district court"

within the meaning of 28 U.S.C. 1291. In this sense, then,

article 3(b) breaks with traditional practice by authorizing

direct appeals to the federal courts from certain determinations

regarding extradition. What is more, the pertinent treaty

provision permits successive appeals from a magistrate judge's

decision to the district court and thereafter to the court of

appeals. Because that path was followed here, appellate

jurisdiction attaches.

IV. STANDARD OF REVIEW

Having cleared the jurisdictional hurdle, we turn next

to appellant's asseveration that the district court employed a

faulty standard of review. Because this presents a purely legal

question, requiring an interpretation of the Supplementary

Treaty, our review is plenary. See, e.g., United States v.

Washington, 969 F.2d 752, 754 (9th Cir. 1992), cert. denied, 113

S. Ct. 1945 (1993); Quinn, 783 F.2d at 791.

A. Principles Governing Review.

Determinations concerning article 3(a) defenses "shall

12

be immediately appealable by either party" through the

instrumentality of "filing a notice of appeal." Supplementary

Treaty, art. 3(b). But, though this article grants rights of

appeal, it does not mention standards of review. We look,

therefore, to first principles.

Absent a specific statutory directive to the contrary,

appeals in the federal court system are usually arrayed along a

degree-of-deference continuum, stretching from plenary review at

one pole to highly deferential modes of review (e.g., clear

error, abuse of discretion) at the opposite pole. At the "no

deference" end of the continuum lie appeals involving

unadulterated questions of law, the resolution of which

customarily entails de novo review. See, e.g., Liberty Mutual

Ins. Co. v. Commercial Union Ins. Co., 978 F.2d 750, 757 (1st

Cir. 1992). At the other end of the continuum lie appeals

involving straight factual determinations, the resolution of

which customarily entails acceptance of the trier's judgment in

the absence of palpable error. See, e.g., Cumpiano v. Banco

Santander Puerto Rico, 902 F.2d 148, 152 (1st Cir. 1990) (holding

that appellate courts "ought not to upset findings of fact or

conclusions drawn therefrom unless, on the whole of the record,

[the appellate judges] form a strong, unyielding belief that a

mistake has been made"); see also Fed. R. Civ. P. 52(a).

There are, however, difficulties in classification.

Many cases involve what courts term "mixed" questions questions

which, if they are to be properly resolved, necessitate combining

13

factfinding with an elucidation of the applicable law. The

standard of review applicable to mixed questions usually depends

upon where they fall along the degree-of-deference continuum:

the more fact-dominated the question, the more likely it is that

the trier's resolution of it will be accepted unless shown to be

clearly erroneous. See, e.g., United States v. Mariano, 983 F.2d

1150, 1158-59 (1st Cir. 1993); Roland M. v. Concord Sch. Comm.,

910 F.2d 983, 990-91 (1st Cir. 1990), cert. denied, 111 S. Ct.

1122 (1991).

Given that the Supplementary Treaty is silent on the

subject, we presume that the framers, in providing for appeals to

the federal courts, intended ordinary standards of review to

apply. See S. Exec. Rep. No. 17, supra, at 8 ("Nothing in

article 3(b) is to be interpreted as . . . upsetting established

rules of appellate procedure."); see also Gioiosa v. United

States, 684 F.2d 176, 179 (1st Cir. 1982) (discussing standard of

review in appeal from magistrate to district court). Because

issues of the sort envisioned in article 3(a) are typically fact-

specific, appellate review of findings anent such issues will,

absent an error of law, most often proceed under the clear-error

rubric. See, e.g., Pullman-Standard v. Swint, 456 U.S. 273, 289-

90 (1982) (reviewing district court findings anent race

discrimination for clear error); Beasley v. Health Care Serv.

Corp., 940 F.2d 1085, 1088 (7th Cir. 1991) (similar in respect to

discrimination based on religious beliefs); Rendon v. A T & T

Technologies, Inc., 883 F.2d 388, 392 (5th Cir. 1989) (similar;

14

discrimination based on national origin); Gierbolini-Colon v.

Aponte-Roque, 848 F.2d 331, 333 (1st Cir. 1988) (similar;

political discrimination); but cf. Bose Corp. v. Consumers Union

of United States, Inc., 466 U.S. 485, 514 (1984) (holding that

clearly erroneous standard does not apply to review of quasi-

legal "finding" of actual malice in First Amendment context).

This conclusion is buttressed by analogy to traditional

habeas corpus practice in the extradition field. When a party

collaterally challenges a magistrate's determination of

extraditability, judicial review is sharply circumscribed. See,

e.g., Fernandez v. Phillips, 268 U.S. 311, 312 (1925); In re

Manzi, 888 F.2d 204, 205 (1st Cir. 1989) (per curiam), cert.

denied, 494 U.S. 1017 (1990). The most prominent exception is

for a claim that the crime constitutes a non-extraditable

political offense. Review of political offense determinations

follows the continuum analysis described above. See Quinn, 783

F.2d at 790-91 & n.9. Because defenses under article 3(a) are

analogous to political offense determinations indeed, the

fundamental compromise undergirding the Supplementary Treaty

treated the one as a replacement for the other common sense

suggests that the same standard of review should apply.

Last, but surely not least, appellant's contention that

district court review under article 3(b) must always be de novo

is at war with the words and purposes of the Supplementary

Treaty. The treaty expresses a strong interest in expediting

extradition matters. See Supplementary Treaty, art. 3(b)

15

(providing for "immediate[]" appeals and requiring "expedited

consideration at every stage"). The legislative history is in

the same vein. See, e.g., 132 Cong. Rec. 16,607 (1986)

(admonishing that the treaty's safeguards should not afford

"protracted sanctuary in the United States"). Wholesale de novo

review not only would ignore the factfinder's superior vantage

point for judging the intricacies of a contested case but also

would be wasteful, engendering unwarranted delays in the

extradition process.

In general, then, reviewing courts should apply the

clearly erroneous standard to the trier's findings of fact in

situations where article 3 of the Supplementary Treaty is in

play.

B. Applying the Principles.

In this case, the district court treated the

magistrate's finding that no cognizable article 3(a) defense

existed as factual in nature and applied the clearly erroneous

test. As to appellant's principal claim that, if extradited,

he would suffer prejudice on account of his race or nationality

we endorse the district court's choice of a standard of review.

The claim in question challenged the magistrate's underlying

factual determination that, on the evidence adduced, appellant

had not proved meaningful prejudice. This fact-intensive finding

evokes clear-error review.4

4Since this is a successive appeal, we evaluate for
ourselves whether clear error characterized the magistrate's
factual finding that appellant failed to prove the existence of

16

There is, however, a second facet of appellant's claim,

as to which the district court chose the wrong standard of

review. The magistrate held that article 3(a) does not

necessarily bar extradition whenever a respondent shows the

existence of some preformed ideas in the requesting nation but

that the biases must rise to a level where they actually

prejudice the respondent before article 3(a) affords relief.5

The soundness of this analysis which depends upon whether the

terms employed in article 3(a) encompass all nationality-based

and race-based biases or only those directly affecting a

particular respondent involves interpretation of the

Supplementary Treaty. Treaty interpretation is a purely legal

exercise as to which, under the criteria limned above, see supra

Part IV(A), no deference is due to the trier. Accordingly, the

district court should have scrutinized the magistrate's ruling on

this issue de novo.

That the district court failed to afford plenary review

on this aspect of the case does not mean that we must remand. To

do so would needlessly throw the helve after the hatchet. See

Gioiosa, 684 F.2d at 179. Rather, because the question is

cognizable prejudice under article 3(a). See infra Part VI.

5In a second branch of his analysis, the magistrate found
that, in any event, the weight of the evidence against Howard was
so great that no decisionmaker would be distracted from it by
whatever slight biases might exist. We express no opinion on the
appropriateness of this analytic approach as appellant "does not
suggest that the [magistrate] was expected to ignore the weight
of the probable cause evidence" in making his article 3(a)
determination. Appellant's Brief at 25.

17

quintessentially legal and this court is fully capable of

deciding it without any further development of the record, we can

simply address and resolve it. See, e.g., Societe Des Produits

Nestle, S.A. v. Casa Helvetia, Inc., 982 F.2d 633, 642 (1st Cir.

1992); Gioiosa, 684 F.2d at 179.

V. PREJUDICE UNDER THE SUPPLEMENTARY TREATY

With this preface, we proceed directly to the treaty-

interpretation question, affording plenary review.

A. Traditional Practice.

A sovereign's right to obtain the extradition of an

accused is created by treaty; where there is no treaty, a

requested nation has no duty to extradite. See Factor, 290 U.S.

at 287. Indeed, federal courts have stated that no branch of

government has authority to surrender an accused to a foreign

country except in pursuance of a statute or treaty. See Quinn,

783 F.2d at 782 (collecting cases).

An extradition treaty does more than bridge this gap.

The existence of such a treaty between the United States and

another nation indicates that, at least in a general sense, the

executive and legislative branches consider the treaty partner's

justice system sufficiently fair to justify sending accused

persons there for trial. See Glucksman v. Henkel, 221 U.S. 508,

512 (1911); Neely v. Henkel (No. 1), 180 U.S. 109, 123 (1901).

In habeas corpus proceedings, this rationale has produced the

rule of noninquiry a doctrine which forbids judicial

authorities from investigating the fairness of a requesting

18

nation's justice system when considering whether to permit

extradition to that nation. See Glucksman, 221 U.S. at 512;

Manzi, 888 F.2d at 206 (collecting cases).6

Of course, the signing of a treaty does not forever put

to rest questions concerning the fairness of another country's

legal framework. For example, an extradition target may present

such issues to the Secretary of State the official who

ultimately decides whether a person found to be extraditable

should in fact be extradited. See 18 U.S.C. 3186. But,

traditionally, in extradition cases, the judiciary neither asks,

nor seeks to answer, questions about the sensitivities and

sophistication of courts abroad.7

B. Scope of Article 3(a).

The Supplementary Treaty openly alters this traditional

practice. It requires judges to shun extradition if the accused

6The government suggests that the Constitution mandates the
rule of noninquiry. We disagree. The rule did not spring from a
belief that courts, as an institution, lack either the authority
or the capacity to evaluate foreign legal systems. Rather, the
rule came into being as judges, attempting to interpret
particular treaties, concluded that, absent a contrary indication
in a specific instance, the ratification of an extradition treaty
mandated noninquiry as a matter of international comity. No
doubt the rule exemplifies judicial deference to executive
authority, see Koskotas, 931 F.2d at 174, but it is a deference

stemming at least in part from the fact that the executive is the
branch which most likely has written and negotiated the document
being interpreted.

7The judiciary has, however, explicated a number of other
limitations on extradition. See, e.g., Manzi, 888 F.2d at 207

(explaining that the principle of double criminality bars
extradition unless the offense is a crime in both countries);
Quinn, 783 F.2d at 792-810 (discussing origin of, and basis for,

political offense exception in extradition proceedings).

19

either establishes that the request "has in fact been made with a

view to try or punish him on account of his race, religion,

nationality or political opinions," or if he proves that "he

would, if surrendered, be prejudiced at his trial or punished,

detained or restricted" on account of any of these factors.

Supplementary Treaty, art. 3(a). These phrases cannot be brushed

aside as a series of scrivener's errors: to the exact contrary,

Congress intended the words to authorize inquiry into the

attributes of a country's justice system as that system would

apply to a given individual. See S. Exec. Rep. No. 17, supra, at

4-5; 132 Cong. Rec. 16,798-803 (1986). Moreover, Congress

evidently knew that its command reversed years of extradition

practice forbidding judicial investigation into such areas. See

132 Cong. Rec. 16,800 (1986) (describing article 3(a) as "a very

broad, and far reaching provision"); id. at 16,806 (labelling

this aspect of the treaty "historic").

Still, the article 3(a) defense, though a refreshing

zephyr to persons resisting extradition, is not of hurricane

force; its mere invocation will not sweep aside all notions of

international comity and deference to the requesting nation's

sovereignty. At least four principles rein in the winds of

change. First, elementary rules of construction dictate that the

defense not be construed so expansively as to negate the

remainder of the treaty. See, e.g., Factor, 290 U.S. at 292-93.

The rule of noninquiry developed from the assumption that an

extradition treaty, by its very existence, constitutes a general

20

acceptance of another country's legal system. See supra Part

V(A). By like token, the existence of an overall agreement on

extradition must inform the workings of the article 3(a) defense,

limiting its applicability to specific problems encountered by

specific respondents, as opposed to general grievances concerning

systemic weaknesses inherent in every case. Otherwise, the

extradition treaty actually becomes an impediment to extradition,

in other words, a non-extradition treaty. See 132 Cong. Rec.

16,607 (1986).

Second, controlling precedent requires that, where

possible, we interpret extradition treaties to produce

reciprocity between, and expanded rights on behalf of, the

signatories:

[Treaties] should be liberally construed so
as to effect the apparent intention of the
parties to secure equality and reciprocity
between them. For that reason, if a treaty
fairly admits of two constructions, one
restricting the rights which may be claimed
under it, and the other enlarging it, the
more liberal construction is to be preferred.

Factor, 290 U.S. at 293-94. These principles of reciprocity and

liberal construction have particular force here because the

United States, unlike the U.K. and certain other nations, has no

available machinery for prosecuting those who commit crimes

abroad but who are, nonetheless, non-extraditable. See 132 Cong.

Rec. 16,587 (1986).

Third, article 3(a) requires an accused to establish

that he would, if surrendered, be "prejudiced" on account of

particular factors. In our view, this word denotes that only

21

those preformed ideas relative to race, nationality, and the like

which are of sufficient magnitude actually to affect the

accused's situation, i.e., to "prejudice" him, trigger the

special prophylactic protections of the Supplementary Treaty.

Finally, the legislative history suggests that, in

insisting upon the inclusion of article 3(a), the Senate was

concerned largely with the special Diplock court system

applicable to those accused of terrorist acts in Northern

Ireland. See 132 Cong. Rec. 16,806-19 (1986). There is no

indication that the defense was meant as a slur upon, much less

an indictment of, the British legal system.

For these four reasons, we conclude that the soil of

this case is particularly inhospitable to a rambling

interpretation of article 3(a). We hold, therefore, that, in

order to avail himself of the article 3(a) defense, an

extradition target must establish by a preponderance of the

credible evidence that, if he were surrendered, the legal system

of the requesting country would treat him differently from other

similarly situated individuals because of his race, religion,

nationality, or political opinions. It is not enough simply to

show some possibility that preformed ideas might exist; rather,

under the terms of the Supplementary Treaty, the bias must rise

to the level of prejudicing the accused. See generally William

M. Hannay, Committee Report: An Analysis of the U.S.-U.K.

Supplementary Extradition Treaty, 21 Int'l Law. 925 (1987).

C. Appellant's "Per Se Prejudice" Argument.

22

We now face the task of applying the prejudice standard

in this case. The record reveals that the magistrate paid

careful attention to an array of facts that sometimes pointed in

different directions. For instance, he found that there were

some negative articles about Howard, that some Britons might be

biased against black Americans, and that the U.K. does not

utilize a voir dire procedure to screen venirepersons.

Nonetheless, in the magistrate's eyes, these facts did not

establish an article 3(a) defense because countervailing

considerations mitigated their negative impact, rendering any

bias de minimis. Appellant excoriates this finding, complaining

that it rests upon a faulty legal premise. He asserts that

article 3 effectively eclipses the rule of noninquiry; that the

evidence he tendered constitutes per se proof of prejudice which

irrebuttably establishes an article 3(a) defense; and that the

Supplementary Treaty does not countenance consideration of

countervailing factors in mulling whether a defense is extant.

We concur with the magistrate that the Supplementary Treaty

stakes out a middle ground between the classic rule of noninquiry

and the total abolition of that rule: the treaty alters the

traditional formulation of the rule while simultaneously

preserving many aspects of it. Any other interpretation would

run afoul of the four constraining principles we have identified.

See supra at 20-21.

One manifestation of this middle position is that

article 3(a), as we read it, imposes a de minimis threshold

23

requirement relative to the existence of prejudice. For example,

because international criminal affairs are frequently high

profile, a per se rule barring extradition whenever there has

been any negative publicity would undermine the entire treaty by

making successful article 3(a) defenses virtually automatic and

relegating extradition to a few fringe instances. We do not

think that the treaty partners intended so unproductive a result.

Similar reasoning rules out any per se prohibition on extradition

when the accused proffers evidence suggesting discordant race

relations in the U.K. or when he simply points to the absence of

a specific procedural device.

Consequently, we hold that, while a magistrate

considering the applicability of article 3(a) must weigh each of

the factors cited by appellant if an extradition target offers

proof that they exist, their mere presence, without more, does

not conclusively establish an article 3(a) defense.8 The

something "more," as we have indicated, is prejudice to the

8This interpretation finds analogies in prevailing federal
court practice. For instance, we have routinely held that the
mere presence of differing procedural devices, pretrial
publicity, or allegations of community prejudice, without more,
does not warrant overturning a criminal conviction. See, e.g.,

Neron v. Tierney, 841 F.2d 1197, 1199 (1st Cir.) (admonishing

against the use of habeas corpus to superimpose federal
procedural choices upon state courts merely because the federal
court thinks some "other" procedure might be "better"), cert.

denied, 488 U.S. 832 (1988); United States v. Reveron-Martinez,

836 F.2d 684, 687 (1st Cir. 1988) (ruling that pretrial
publicity, even though pervasive and negative, did not warrant a
presumption of prejudice); United States v. Gullion, 575 F.2d 26,

28 (1st Cir. 1978) (explaining that the mere existence of
community prejudice, in and of itself, does not necessitate
relief).

24

extradition target. It follows that the magistrate correctly

construed article 3(a) to require a showing of actual,

respondent-specific prejudice.9 Appellant's per se challenge to

the magistrate's reasoning must, therefore, fail.

VI. THE MERITS OF THE ARTICLE 3(a) DEFENSE

This brings us to the merits of Howard's fact-based

challenge to the decision below an issue that gives us some

pause.10 Nevertheless, in seeking to secure an article 3(a)

defense, an extradition target bears a heavy burden. He must

establish, by a preponderance of the evidence, that he would, if

surrendered, be prejudiced on account of a proscribed factor.

See Supplementary Treaty, art. 3(a); see also 132 Cong. Rec.

16,607 (1986). Having painstakingly reviewed the papers in the

case in light of the burden of proof, we cannot say that clear

error inheres.

Appellant introduced numerous newspaper articles,

affidavits from several people living in Great Britain, and the

testimony of Paul Stevenson, a senior executive officer of

England's Commission for Racial Equality, in an attempt to

9We note, in passing, that the rules governing criminal
trials in the federal courts seem fully compatible with such a
requirement. See, e.g., Fed. R. Crim. P. 52(a) ("Any error,

defect, irregularity or variance which does not affect
substantial rights shall be disregarded.").

10We refer only to appellant's claim that, if extradited, he
would be prejudiced on account of his race. He presented little,
if any, evidence suggesting the existence of nationality-based
biases in this case, and we cannot discern any error (clear or
otherwise) in the magistrate's finding that appellant failed to
prove cognizable prejudice of this genre.

25

establish that widespread publicity would prevent him from

receiving fair treatment abroad. But, this evidence comprises a

mixed bag. It is true that some of the press clippings contained

racial innuendo. On the other hand, the publicity was mercifully

brief in duration, for the most part lasting less than a week;

the U.K.'s Contempt of Court Act has been invoked and will cut

off any further untoward publicity; Howard's counsel himself

created some of the notoriety in his rousing remarks to the

British press; the media coverage was not uniformly or

overwhelmingly negative (indeed, some of the newspaper articles

describe appellant favorably); and, finally, the publicity

occurred over two years ago and will be very old news when and if

appellant eventually comes to trial in England. On this

conflicted record, the magistrate did not perpetrate clear error

in finding that a spurt of mixed publicity created in part by

appellant's counsel and occurring years ago failed to rise to the

level of prejudice necessary to sustain an article 3(a) defense.

The evidence in the record concerning the supposed

shortcomings of the requesting nation's legal system does not

require a different result for it, too, is mixed. Admittedly,

appellant presented affidavits and testimony suggesting that

preformed ideas constitute a particular threat in the

circumstances of this case because the English system does not

provide for American-style voir dire of potential jurors. But,

evidence submitted by the government and elicited from

appellant's witness on cross-examination indicates that the

26

English legal system has a host of other mechanisms which will be

available to appellant and which mitigate the absence of voir

dire. Appellant will be able to present his arguments concerning

the impact of pretrial publicity and race relations during

committal proceedings in the U.K. He may then renew the

arguments by requesting pretrial review at the Crown Court, again

before the trial judge, and still again on appeal from any

conviction. In addition, the English system provides for self-

excusal of potentially biased jurors and trial judges are duty

bound to offer detailed jury instructions concerning the

impropriety of grounding defendants' convictions on extraneous

considerations. Seen in this light, the absence of voir dire in

the English system is not of decretory significance. After all,

courts must not let jingoism run amok, but, rather, must turn a

sympathetic ear to other nations' independent judgments about how

best to ensure fairness in dealing with criminal matters. The

United States has no monopoly on even-handed justice.

To summarize, the evidence concerning prejudice,

properly decanted, is ambivalent. The facts we have catalogued,

and others in the record, comprise adequate support for the

magistrate's conclusion that any evidence of bias relating to

appellant's race is so exiguous as not to animate article 3(a).

Put another way, the magistrate weighed the proof, drew a series

of reasonable (albeit not inevitable) inferences from it, and

concluded that appellant had not carried the burden of proving

prejudice. We cannot say that this choice between two plausible

27

alternatives, each of which finds support in the record,

constitutes clear error. See Anderson v. City of Bessemer City,

470 U.S. 564, 573-74 (1985); United States v. Rodriguez-Morales,

929 F.2d 780, 784 (1st Cir. 1991), cert. denied, 112 S. Ct. 868

(1992).

VII. CONCLUSION

We need go no further.11 Article 3 of the

Supplementary Treaty significantly alters the pattern of

procedural avenues and substantive rights traditionally available

in extradition cases. While these alterations reconfigure the

extradition landscape, they do not render it impassable.

Following the map that Article 3 supplies, we conclude that we

have jurisdiction to consider appellant's claims; that the

standard of review governing his legal challenge is de novo; that

the standard of review governing his fact-based challenge is for

clear error; that appellant's arguments anent the scope of the

article 3(a) defense envision a grandeur which lacks support in

the treaty's language or in the applicable law; and, that, in the

last analysis, the magistrate's findings of fact derive enough

support from the record to withstand attack. Accordingly, the

11We do not tarry over the assertion that the magistrate
erred in denying appellant's motions to stay proceedings and to
supplement the evidence. These motions were addressed to the
magistrate's discretion, and he provided ample reasons for their
denial. In the same vein, we see no error in the magistrate's
discretionary decision allowing the government to file
confirmatory materials out of time. On this score, the
sockdolager is that appellant neither sought to reopen the record
to counter or contest the belated evidentiary proffer nor
requested time for this specific purpose. He cannot now be heard
to complain that he had no chance to respond.

28

district court lawfully upheld the magistrate's issuance of a

certification of extraditability.

Affirmed.

Concurring Opinion Follows

29

CAMPBELL, Senior Circuit Judge (Concurring). While

joining in the court's opinion, I am troubled by our

resolution of the "successive appeals" issue. Article 3(b)

provides that a finding concerning an Article 3(a) defense,

involving race, religion, nationality, or political opinion,

"shall be immediately appealable by either party to the

United States district court, or court of appeals, as

appropriate." We hold that this unclear language does not

indicate that an appellant receives only one appeal i.e.,

an appeal to the district court, if the initial extradition

decision was by a magistrate, or an appeal to the court of

appeals if the initial extradition decision was by a district

judge but rather was meant to provide, however clumsily,

for the full federal appellate process. Thus, where as here

the initial extradition decision was by the magistrate,

appellant can appeal, (1) to the United States district

court; (2) from the district court to this court; and, I

assume, (3) from this court to the Supreme Court by writ of

certiorari.

It is sad but true that this interpretation of the

ambiguous language while seemingly what was intended

creates significant new opportunities for persons to delay

their extradition. Historically, extradition decisions by a

judge or magistrate were not appealable, thus avoiding the

potential delays which often attend appellate review.

-29-
29

Obviously, the more extradition is susceptible to being

bogged down in endless procedural maneuvering, the greater

the danger that essential witnesses to the charged crime may

die or disappear and their memories fade prior to trial. It

used to be thought that the interest of another civilized

nation in enforcing its criminal law entitled it to the

reasonably prompt extradition of accused persons. The

present appeal to this court has enabled appellant to delay

trial in Great Britain by another year or more.

It would have been useful had the United States of

America gone more deeply, in its briefs before us, into the

pros and cons of the proper interpretation of Article 3(b).

In a Treaty case of first impression, the interpretation

espoused by the Attorney General can be enlightening. As

best I can tell, the Attorney General agrees with the court's

reading of the Treaty, i.e., that the full federal appellate

process, and not a truncated version, was intended. However,

the alternative interpretation what my colleagues call the

"one bite of the apple" approach has some appeal given

Article 3(b)'s literal language and the long tradition

divorcing extradition from the normal appellate process. We

could have benefited from a more considered explication of

all this by the United States.

In any event, I write separately in order to

emphasize the implications of Article 3(b), as we now

-30-
30

interpret it, so that the drafters of future provisions will

have no illusions concerning the inevitable potential for

delay, and may decide whether other approaches would be

desirable.

-31-
31